CHEN, Circuit Judge,
dissenting-in-part.
I join the majority opinion except for Parts B.II.b and B.V. To properly inter *1367 pret the BPCIA’s patent litigation management process described in section 262(Z), I agree that none of subsection (Z)’s provisions may be read in isolation. In other words, to understand the meaning of any one provision in § 262(Z), one must first recognize how it interrelates with the rest of subsection (Z) and the rest of the BPCIA. Based on this understanding, I agree that a subsection (k) applicant’s failure to supply the information described in (Z )(2) to the reference product sponsor (RPS) is not a violation of the BPCIA, because the BPCIA itself, in (Z )(9) and § 271 (e) (2) (C) (ii), provides the RPS the remedial course of action in such circumstances. Contrary to the majority, however, I view this context-based interpretation as applying with equal force to the interpretation of (Z )(8). When reading (Z )(8) in the context of subsection (Z) as a whole, it becomes clear that (Z)(8) is simply part and parcel of the integrated litigation management process contemplated in (Z)(2)(Z)(7). Moreover, just as all the “shall” obligations set forth in (Z )(3)-(Z )(7) are contingent on the (k) applicant’s performance of the first “shall” step in (Z )(2), this is also true of the “shall” notice obligation in (Z)(8). What this means is when, as here, the (k) applicant fails to comply with (Z)(2), the provisions in (Z )(S)-(Z )(8) cease to matter. In such a situation, as recognized by the majority opinion, the RPS’s course of action is clearly defined in (Z )(9) and § 271(e)(2)(C)(ii): the unfettered right to immediately pursue patent infringement litigation unconstrained by any of the timing controls or limits on the number of patents it may assert that would result from the (Z )(2)-(Z )(8) process. Based on this understanding, I do ‘not view (Z )(8)(A) as a “standalone provision” that provides, implicitly, the RPS a 180-day injunction beyond the express twelve-year statutory exclusivity period. Because the majority opinion interprets (Z )(8) differently, giving Amgen, the RPS, an extra-statutory exclusivity .windfall, I respectfully dissent.
I
“It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.” Davis v. Mich. Dep’t of Treasury, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). To that end, the Supreme Court has instructed that “statutory language cannot be construed in a vacuum.” Id.; see also Yates v. United States, — U.S.-, 135 S.Ct. 1074, 1081-82,191 L.Ed.2d 64 (2015) (instructing courts to interpret statutory text by reference to “the specific context in which that language is used, and the broader context of the statute as a whole.” (quotation marks omitted)). In Part B.I, the majority properly recognizes that “the ‘shall’ provision in paragraph (Z)(2)(A) cannot be read in isolation.” Majority Op. at 1355. The majority carefully examines the larger statutory context — subsection (Z) and § 271 (e)(2)(C)(ii) — and correctly concludes that “ ‘shall’ in paragraph (Z )(2)(A) does not mean ‘must.’ ” Majority Op. at 1355. As the majority recognizes, nothing in the BPCIA grants the RPS a procedural right to compel the (k) applicant’s compliance with (Z )(2)(Á). In Part B.II, however, the majority holds that the word “shall” in (Z )(8)(A) carries a different meaning than it does in (Z)(2)(A). To reach that inconsistent result, the majority takes the view that (Z )(8)(A) should be read in a vacuum, apart from the context and framework of subsection (Z), including the language of (Z )(8)(B). I respectfully disagree.
A
Entitled “Patents,” § 262(Z) of the BPCIA concerns one thing: patent litigation. Specifically, it specifies an elaborate *1368 information exchange process between the (k) applicant and the RPS that leads up to the expected patent infringement suit that comes during the pendency of a subsection (k) application. This process begins in (l )(2)(A) with the requirement that the (k) applicant disclose to the RPS its biosimilar application (aBLA) and manufacturing process information. Compliance with subsection (Í )(2)(A) triggers a cascade of events contemplated by subsection (l), with each successive step reliant on the performance of one or more preceding steps. This intricate process includes: the exchange of patent lists that each party believes the RPS has reasonable grounds to assert against the (k) applicant, as well as the exchange of respective infringement, validity, and enforceability positions (§ 262(l )(3)); a process by which the parties may limit the patents in the infringement lawsuit (§ 262(£ )(4)-(5)); a patent infringement lawsuit, filed by the RPS, limited to the patents listed in (l )(4) or (l)(5) (§ 262(i)(6)); a procedure for updating the RPS’s previously created (l )(3) patent list with newly issued or licensed patents (§ 262(Z)(7)); a requirement that the (k) applicant provide a 180-day notice ahead of commercial marketing thereby giving the RPS time to seek a preliminary injunction on any (l )(3) listed patents not asserted in the limited (Z)(6) patent infringement suit (§ 262(Z)(8)); and authorization for the RPS to file an immediate declaratory judgment action for patent infringement if the (k) applicant fails to comply with its specified obligations recited in (0(2), (0(3), (0(5), (0(6), (0(7), or (0(8) (§ 262(0(9)(B)-(C)). Importantly, subsection (l) does not relate to the FDA approval process (for that see subsection (k)). Nor is the approval process contingent on any events related to a possible patent dispute occurring in parallel with that approval process.
By enacting the provisions in subsection (,l), Congress created a comprehensive, integrated litigation management system. These provisions also demonstrate that Congress anticipated the situation before us here, in which the (k) applicant refuses to engage in this litigation management process. Rather than forcing the (k) applicant, by court order or some other means, to engage in the subsection (l) process, or conditioning the (k) application’s approval on the (k) applicant fulfilling the requirements set forth in subsection (Z), Congress instead authorized the RPS in this situation to immediately file an infringement action. See § 262(Z)(9) and 35 U.S.C. § 271(e)(2)(C)(ii).
Focusing on (Z)(8), Congress accounted for the possibility (perhaps strong likelihood) of a situation in which the (k) applicant has received FDA approval and is on the verge of commercially marketing its biosimilar product but the RPS was unable to assert all of its (Z)(3) listed patents against the (k) applicant in the limited (Z)(6) patent litigation. Entitled “Notice of commercial marketing and preliminary injunction,” (Z)(8), in relevant part, is set forth below:
8) Notice of commercial marketing and preliminary injunction
(A) Notice of commercial marketing The subsection (k) applicant shall provide notice to the reference product sponsor not later than 180 days before the date of the first commercial marketing of the biological product licensed under subsection (k).
(B) Preliminary injunction
After receiving the notice under subpar-agraph (A) and before such date of the first commercial marketing of such biological product, the reference product sponsor may seek a preliminary injunction prohibiting the subsection (k) applicant from engaging in the commercial manufacture or sale of such biological product until the court decides the issue of patent validity, enforcement, and in *1369 fringement with respect to any patent that is—
(i) included in the list provided by the reference product sponsor under paragraph (S)(A) or in the list provided by the subsection (k) applicant under paragraph (3)(B); and
(ii) not included, as applicable, on—
(I) the list of patents described in paragraph (4); or
(II) the lists of patents described in paragraph (5)(B).
Subsection (Z )(8)(A) requires the (k) applicant to give the RPS at least 180 days’ notice of its intent to begin commercially marketing the biosimilar product. One of the key questions in this appeal is, “Why would Congress insert a 180-day commercial marketing notice provision in a subsection devoted to organizing patent litigation?” Paragraph (Z )(8)(B) provides the answer. As mentioned above, the process in (Z)(4)-(5) can result in restricting the (Z)(6) infringement action to a subset of the RPS’s patents identified in (Z )(3). Rather than permit the (k) applicant to launch its biosimilar product while the RPS is blocked from enforcing some of its patent rights, subsection (Z )(8)(B) addresses that problem by authorizing the RPS to seek a preliminary injunction prohibiting commercial manufacture or sale based on the patents that were excluded from the (Z )(6) action. Thus, the entirety of (Z )(8), including (Z)(8)(A)’s notice' provision, serves to ensure that an RPS will be able to assert all relevant patents before the (k) applicant launches its biosimilar product. Amgen confirmed this understanding of (Z)(8)’s purpose at oral argument. Oral Argument at 20:10-20:05, Amgen, Inc. v. Sandoz Inc., No. 2015-1499 (Fed.Cir. June 3, 2015), available at http://www.cafc. uscourts.gov/oral-argument-recordings/15-1499/all.
Given the purpose of (Z)(8) and its express assumption that the parties have already performed the steps in (Z )(3), and (Z )(4)-(Z )(5), the most logical conclusion when reading (Z)(8) in context is that (Z)(8)’s vitality is predicated on the performance of the preceding steps in subsection (Z)’s litigation management, process. Without first engaging in these procedures, (Z )(8) lacks meaning. Similarly, for example, the statutory requirement in (Z )(3) for the parties to exchange detailed positions on infringement and validity for the patents listed under (Z)(3) no longer applies if the (k) applicant fails to comply with (Z )(2). Paragraph (Z )(8)’s interdependency on the preceding steps in subsection (Z) is further reinforced by (Z)(7)’s cross-reference to (Z )(8). Paragraph (Z )(7), which sets forth a process for the RPS to update its (Z )(3) patent list with any newly issued or licensed patents, states that any such patents “shall be subject to paragraph (8).” 42U.S.C. § 262(Z)(7)(B). The interwoven structure of subsection (Z) indicates that Congress viewed the procedures of (Z )(8) as inseverable from the preceding steps in (Z).
The majority, on the other hand, views (Z)(8)(A) as a standalone notice provision that is not excused when the (k) applicant fails to comply with (Z)(2).[1] Yet, no one disputes that the requirements of (Z)(3) through (Z)(7) are certainly excused in such a case. I recognize that (Z)(8)(A), unlike (Z )(3) through (Z )(7), is not expressly conditioned on the earlier steps. I cannot, however, read (Z)(8)(A) in complete isolation from (Z)(8)(B), which does refer *1370 ence, and is predicated on the performance of, (i)(3) and (Z )(4)(Z )(5). Thus, (Z)(8) does not serve as a standalone provision; it is part and parcel to, and contingent upon, the preceding steps in the (0(2)-(Z )(8) litigation management regime. The most persuasive reading of subsection (0 as a whole is that Congress provided two paths to resolve patent disputes: (1) the intricate route expressed in (Z )(2)(Z )(8); and (2) the immediate, more flexible route provided in (Z )(9), should the (k) applicant falter on any of its obligations recited in (Z)(2)-(Z)(8).
B
The majority is also concerned with the absence of an express consequence for noncompliance with (Z)(8)(A) in situations in which the (k) applicant does not comply with (Z )(2). I agree with the majority that the remedy in (Z)(9)(B) does not provide relief in this scenario because the RPS’s right to pursue additional patent litigation at this stage under (Z )(9)(B) is contingent on using the patents that have been “included in the list described in paragraph (3)(A).” If a(k) applicant never carries out (Í )(2), the RPS will never create an (Z )(3) patent list. Such a failure to adhere to (Z )(2) would defeat the RPS’s opportunity to invoke (Z )(9)(B) if the (k) applicant refuses to comply with (Z )(8)(A)’s notice provision.
Contrary to the majority’s conclusion, however, the absence of such a remedial provision in (Z)(9)(B) confirms that Congress deemed any additional remedy to be unnecessary. Congress created the fallback provision of (Z)(9)(C) for just these circumstances. An RPS does not need the remedy in (Z)(9)(B) because (Z)(9)(C) and § 271(e)(2)(C)(ii) already grant the right to file, immediately, an unrestricted patent infringement action when the (k) applicant fails to comply with (Z)(2). At this point, the RPS possesses the statutory right to seek a preliminary injunction for any of its patents that “could be identified pursuant to section [262](Z )(3)(A)(i).” 35 U.S.C. § 271(e)(2)(C)(ii). It therefore would have been superfluous for Congress to provide the RPS with authorization to initiate an additional, redundant infringement action under (Z)(9)(B)[2] if the (k) applicant later does not comply with • (Z)(8)(A). Not only is compliance with (Z)(8)(A) unnecessary under such a circumstance, but no additional remedy is needed. Thus, after Sandoz failed to perform the (Z )(2) requirement, the only relevant provision in subsection (Z) became (Z )(9)(C) and § 271(e)(2)(C)(ii).
C
The practical consequence of the majority’s interpretation is that (Z)(8)(A) provides an inherent right to an automatic 180-day injunction. The majority provides no basis in the statutory language to support this automatic injunction.[3] This relief *1371 is analogous to the thirty-month stay of the Hatch-Waxman Act, which provides for an automatic stay during which the FDA cannot approve the ANDA unless the patent infringement suit is resolved or the patent expires. See 21 U.S.C. § 355(j)(5)(B)(iii). If Congress intended to create a 180-day automatic stay it understood how to do so. It could have tied FDA approval to the notice provision. Yet, Congress declined to link FDA approval to a single provision in subsection (Z). At bottom, the majority’s view is in tension with the defined purpose of (Z )(8) while providing the RPS with an atextual 180-day exclusivity windfall.
Notably, nothing in the majority opinion suggests that this automatic injunction remedy would be available in cases where the applicant complied with (Z)(2)(A) by providing its aBLA to the RPS, but later failed to provide notice under (Z )(8)(A). In fact, the majority’s opinion creates an uncomfortable result in which the language of (Z )(8)(A) is interpreted in two different ways, based on the (k) applicant’s actions. In a situation like the present case, the (k) applicant cannot refuse to provide the 180-days’ notice, because under the majority’s reading, (Z)(8)(A) authorizes an automatic entitlement to a 180 day injunction. But if a(k) applicant complies with all the requirements specified in (Z )(2)-(Z )(7), then the (k) applicant may still refuse to comply with the 180-day notice provision. In this scenario, there would be no automatic injunction because (Z)(9)(B) provides the RPS with the authorization to immediately file suit on any patent it listed under (Z )(3). Thus, in one scenario, (Z )(8)(A) provides a 180-day injunction, but in the second scenario it does not. While the result in the latter scenario comes from the plain language of the statute, not so with the former. Nothing in the statute supports this peculiar outcome. As explained above, in my view, the better reading of (Z)(8) is that it does not apply, just as (Z )(3)-(Z )(7) do not apply, when the (k) applicant fails to comply with (Z )(2).
II
To be sure, (Z )(8)(A) is an integral part of the procedures for managing patent litigation that arises as a result of a party filing an aBLA. Nevertheless, (Z)(8)(A) is simply one piece of subsection (Z)’s integrated patent dispute puzzle that ceases to matter, just like all the other pieces preceding (Z )(8) cease to matter, once the (k) applicant fails to comply with (Z )(2). I do not find support in the statutory language to create an automatic 180-day injunction. Just as “shall” in (Z)(2) does not mean “must,” the same is true for the “shall” provision in (Z)(8)(A), once it is read in context with the entirety of subsection (Z).
As the majority opinion recognizes, this case requires us to “unravel the riddle, solve the mystery, and comprehend the enigma” that is the BPCIA. Majority Op. at 1351 n. 1. To fulfill our judicial obligation “to say what the law is,” we must choose from a series of imperfect choices. In my view, the most coherent interpretation of (Z )(8)(A) that is consistent with the rest of the BPCIA is the one I have described above. For these reasons, I respectfully dissent from the majority’s holding that (Z)(8) is a standalone provision with an inherent right to a 180-day injunction. Accordingly, I would dissolve the injunction pending appeal.

. The majority states that Sandoz "concedes” that (Z )(8)(A) is a standalone notice provision, citing to the oral argument. I understand Sandoz's position as accepting that (Z)(8)(A) as a standalone provision is one possible interpretation. Oral Argument at 39:30-40:30, Amgen Inc. v. Sandoz Inc., No. 2015-1499 (Fed.Cir. June 3, 2015), available at http:// www.cafc.uscourts.gov/oral-argument-recordings/15-1499/all.

. It is worth examining (Z )(9)(B) closely for it shows how Congress understood the (Z)(8) notice provision to be one part of the entire subsection (l) litigation management process. Under (Z )(9)(B), if a(k) applicant fails to comply with any of its obligations recited in "paragraph (3)(B)(ii), paragraph (5), paragraph (6)(C)(i), paragraph (7), or paragraph (8)(A),” the RPS may immediately bring an infringement action on any patent the RPS listed in (Z )(3). 42 U.S.C. § 262(Z )(9)(B) (emphasis added). By grouping (Z)(8)(A) with (Z)(3), (Z)(5), (Z)(6), and (Z)(7), all of which are unquestionably part of the litigation management regime, and defining the scope of any infringement action by the patents listed in (Z )(3), Congress evidenced that (Z )(8)(A) is not a provision that stands apart from the others, but is instead part of an integrated regime with each part serving a common purpose.

. The majority believes that (Z )(8)(A)'s notice provision plays a necessary role, when the (k) applicant fails to comply with (Z)(2), to provide the RPS adequate notice of the aBLA and *1371 therefore a meaningful opportunity to assert its patent rights. In my view, the majority reads too much into (l )(8)(A) by empowering it with an injunction right in the limited circumstance when a(k) applicant fails to comply with (Z )(2).